Your Honor, this is the second case of the morning. Call 211-0289, Eagle State, Illinois v. Lawrence v. Lovejoy. On behalf of Mr. Lovejoy, Kim Fawcett, on behalf of the people, Mr. Edwards, Senator. Good morning, counsel. Mr. Fawcett. Good morning, Your Honor. Kim Fawcett, representing Lawrence Lovejoy. With the court's permission, I would argue Issue No. 1 this morning and stand in my brief as to Issue No. 2. I'm not prepared to answer questions on all the issues. Issue 1 being the alleged error in removing Ms. Lovejoy from the jury trial. In terms of relief, we're asking for a new trial based on Issue No. 1 and a fraud hearing based on Issue No. 2. Now, if I may turn to Issue 1. The trial court has used this discretion here by removing Mr. Lovejoy from the afternoon session of his jury trial during the testimony of Tamara Camp. Ms. Camp was the state's DNA expert witness. She was the first witness to testify about the facts of the murder that were incriminating. Ms. Camp's testimony supported the state's bloody footprint theory. Although Mr. Lovejoy was allowed to return to court the following court date, which was the next Tuesday morning, this being a Friday afternoon, he missed entirely Tamara Camp's testimony. Therefore, the trial court's order worked a complete deprivation of Mr. Lovejoy's right of confrontation. Counsel, as I read the record, didn't Ms. Camp provide the only testimony in favor of the defendant that afternoon? I'm sorry, Your Honor, I couldn't hear you. Didn't Ms. Camp provide the only testimony in the defendant's favor that the TMB test was negative for blood? Well, she did say her TMB test was negative for blood. Wasn't that favorable? That's favorable. That was used by defense counsel that told the jury that Tamara Camp's negative for blood test stands, and that was important to the defense view. But she also said that her test was a false negative, that she thought because she found the victim's DNA at the center of that tile, adjacent to the evidence print, that there must be blood there. She said it's consistent with blood. But then she said, I can't think of anything else that it would be but for blood. Therefore, her testimony, notwithstanding her negative for blood conclusion in her report, she repudiated that negative for blood conclusion, called it a false negative. So what her testimony did was to support the bloody footprint theory that the footprint had been made in blood the morning of the murder. So what was the specific prejudice involving to the defendant by the fact that he was removed for that session? Were you alleging what prejudice occurred to the defendant? Yes. The prejudice, first of all, there's a right to face-to-face confrontation in a case like this. We know that generally speaking. I'm sorry? We know that to be the general rule. That's the general rule, and he did not enjoy that. And the prejudice is, first of all, unknowable, as this court has said in the Salgo case. And secondly, the loss of the right to face-to-face confrontation deprived him of the opportunity to have his jury, you see, Tamera Camp, when she was testifying in his presence, when she had to explain that she was wrong in her previous testimony, that the catalyst was the LCV that had been put on the tile before she received it. She said previously the LCV was the catalyst and consumed all the hemoglobin that was supposed to interact with the TMB test. Therefore, she got a negative. This time she said, no, I was wrong. I failed Chemistry 101. The hemoglobin is the catalyst. So she had changed her testimony from the previous hearing trial to this one. The argument is that the defendant would have been available to assist in the cross if it had not been made that he would have helped. He's entitled under the Constitution to have her look him in the eye when she gives that testimony. Let's not put the cart before the horse. Let's talk about this. What's the standard of review with respect to removing a defendant from the court? Under Illinois v. Allen, the leading case, the standard of review is for an abuse of discretion. Abuse of discretion. So let's talk about the actions of the judge to determine whether or not she abused her discretion. This case was before the same judge, and then it came back to her. So there was, I think, an appellate review, and then it came back, correct? Correct. The first time she was before this court, he was before this court, didn't the record indicate that he repeatedly had been disruptive and disrespectful to the court? I would say he repeatedly disregarded the court's admonitions not to make objections. I don't think he was especially disrespectful. There may have been one occasion where he said something, but I don't think he was obstructionist. And besides that, Illinois v. Allen talks about obstructing his trial. And in the first trial, 2007, he did nothing to obstruct the progress of his trial. Under Illinois v. Allen, the trial court has to be able to conclude that the trial cannot proceed with the defendant present in the courtroom. On remand, we're not even talking about the first trial. I'm just telling you, as far as the judge is concerned, you're sitting there and you've been dealing with this behavior consistently for years, as in this case. So on remand, at the pretrial proceeding, the defendant continues to be disruptive, doesn't he? He made pro se objections. He disobeyed the judge's rulings. And the judge said, he ignores my admonitions. The judge was punishing him for that disobedience by giving him a timeout from his trial. And you're saying the judge should have waited until he acted out in front of the jury so that there would be a mistrial? I'm saying that the judge should not have removed him without first trying something else like contempt. But basically, there's no finding that he was going to disrupt the proceedings in front of the jury. There's no evidence in the record that supports the judge's conclusion, which conclusion she never made, that he was going to disrupt the trial. Wasn't there a warning though that he would be removed? I'm sorry? He was warned. He was warned, yes. But a warning is a prerequisite. You cannot remove the defendant until he then misbehaves after warning. So we have it on remand. He, at a pretrial, he continues to be disrespectful and disruptive. Then April 6th, April 28th, again he continues. July 13th, September 9th, October 26th, November 24th, he continues. And he isn't removed until, I think it was in December, after being warned not to interrupt the court again, then he's being removed. Where in Allen, where in Allen does it say that the court has to use less restrictive measures or try to take some less restrictive approach? What Allen says is that the conduct of the defendant must be such that the trial cannot proceed with the defendant in the courtroom. And that there's nothing in those misbehaviors by Mr. Lovejoy that rises to the level of that kind of misconduct. Isn't that the call of the judge? Well, the judge was told by defense counsel that, look, judge, he's never misbehaved at either of these trials. He's always been quiet. The only time he ever made objections was during the pretrial proceedings on legal points. You know, on April 4th, the judge said, your objection is noted for the record. On a previous occasion, he made an objection during a jury construction conference, and they ignored him. All the judge had to do that morning when he said, judge, I move to recuse you, says, your motion is denied. Let's go to lunch. That's all she had to do. And that's what she should have done. And she should have told defense counsel, talk to your client over lunch, and we'll revisit this when we get back. But she was angry at him. She was impatient with him. Impatient after all of this time, counsel? He refused to listen. Your Honor, there's no evidence that he was going to be disruptive during the presence of the jury. But the judge has to wait until the defendant is disruptive in the presence of the jury before the judge can enter the order removing him from the court. And do you have case law that holds that position? I don't think that the judge has to wait if the showing is severe enough. This was very minor disruption. It was nowhere close to the standard that Allen requires. There were alternative things the judge could have done. And it was prejudicial. Not only did Tamara Camp change her testimony with the catalyst, but she also said, now I don't really have any explanation for why my TMB test was negative. And, again, the prejudice is Mr. Lovejoy had the right to have the jury see her look at him when she made those two explanations of the flaws in her testimony. And her testimony was very important because it supported the bloody footprint theory. Well, counsel, if we were to take your argument, let's carry this out to its logical extension, that perhaps I can see the logic. The judge should wait until the defendant acts up during the actual trial because you're making the argument, how do we know he's going to act up during the trial? But, arguably, wouldn't it be far more prejudicial to the defendant to have a judge yank the defendant out of a courtroom in the presence of the jury? He's being tried for murder, and now the jury sees the defendant acting up in this kind of a manner. I think it's more prejudicial to the defendant if you wait until he acts up in the presence of a jury. Well, Your Honor, the issue is an assumption against an implied waiver. Mr. Lovejoy didn't want to waive his right to be present. The judge's ruling, in effect, said, I find that Lovejoy has impliedly waived his right to be present, but he didn't, and she never made that finding, especially. In fact, what she said was, he won't obey me. He doesn't, listen, he ignores my admonitions, and she punished him. But she admonished the jury. I'm sorry? She admonished the jury with respect to his absence. The admonition to the jury is worthless because it cannot cure the lack of face-to-face confrontation. Well, except you would recognize under the case law, and it's clear, the right to face-to-face confrontation under the Constitution in Illinois in the federal government is not absolute. Is that correct? That's correct. Let me ask you one question. Is this case a little bit different? Can we distinguish it from Allen in that Allen was removed for the entire trial? In this particular case, Mr. Lovejoy was only removed for this one particular witness. Well, I'm sorry, Your Honor. Mr. Allen was removed for the state's case. He was representing himself, and he was removed during the jury selection, and then he was allowed to come back after lunch. So after lunch, he came back and continued to be disruptive, threatening the judge, throwing counsel's file on the floor. He was allowed to return to the courtroom for the defense case. He was out for the state's defense case. He was representing himself. With standby counsel. Correct. But in this case, your client was only removed for this one particular witness, correct? That's correct. But the Salgado case says that that's enough, and so does the Mallett case. I've cited Salgado in my opening brief and Mallett in my reply brief. This is not just any witness. This is a very important witness. It was the linchpin of the state's case. The Supreme Court said that in its prior opinion, and it remains true in this instance because Tamera Camp said the victim's DNA is at the top. It's at the center of the tile, and that is consistent with blood being present at the center of the tile. And therefore, if there's blood at the center of the tile, the inference was there's blood at the adjacent evidence print. Well, didn't they find blood under, like, the door jamb that they lifted? And didn't they find her DNA on the blood under there? The metal strip was removed. When she got that tile, there was a white strip on the edge. She put the TMB test on the center and on the edge. On the edge, it turned aqua, which is supposed to do if there's blood. And on the center, it did nothing. But on the edge, it found the victim's DNA where it had turned aqua and the DNA of an unknown male who was not Mr. Lovejoy. In other words, Lovejoy was excluded from the unknown male DNA on that white strip. It was a white strip because the metal stripping had been over it and covered it, and it didn't get any LCD on it, probably no superglue on it. So, yeah, she found the victim's blood under the door strip and unknown male DNA. And her testimony about that was, you know, well, I think they basically didn't treat that as the same as the footprint, but I don't see why it shouldn't be treated co-equal with the footprint, which is one of my arguments for why this error cannot be harmless beyond a reasonable doubt. The argument about the footprint is, and we don't question that's Lovejoy. We know that's Lovejoy's footprint. He had to run to the house for two weeks before that murder, but he was innocently placed there previously. And her argument is that there was blood adjacent. If there's blood associated with the adjacent print, then that means it was made that morning. Well, if the victim's blood is associated with the unknown male DNA, why isn't that also presumed to be made that morning? In other words, there's an argument for innocence for Mr. Lovejoy based upon the fact that he was excluded from that male DNA under the strip. The state will tell you, well, we don't know when DNA is put down, when it was put down. All we know is that it's there. Okay, fair enough. But the argument here is that you've got blood associated with the footprint, which everyone agrees could have been made ahead of time because he had to run to the house. And you have blood associated with unknown male DNA under the doorstrip. Why not say that's a jury question that needs to be resolved in a fair trial? The error here cannot be harmless beyond a reasonable doubt. This is a case of circumstantial evidence. Well, counsel, the overarching issue I think we can agree is whether the trial court abused its discretion in firing the defendant from the courtroom when it did. We know we have the general right of confrontation. I think we probably can pretty much agree on the general principles of law that apply to this case. But what I'm trying to call out from your argument is if he would have been there, did you make any record of suggestion that the defendant would have been able to assist in the cross-examination of Ms. Camp? He has a right to be there. We don't have that burden, Your Honor, to show that we would do something with our lawyer to be present. We have that burden to show. I fully understand that, but I'm trying to find an element of some prejudice in what you're saying here. You're saying, well, okay, he shouldn't have been barred, but even aside from that, is there some showing that this barring of him with regard to this particular witness and this particular testimony, it would have been helpful if he was there? Yes, Your Honor. The defense lawyer made the argument to the judge on reconsideration that the jury is going to hold his absence against him and think that he was intentionally ducking Tamara Camp's testimony out of consciousness of guilt. And the defense lawyer asked the judge to tell the jury why the lawyer was not present that afternoon. The state objected. The judge said, no, I'm not going to do that. But the judge instructed the jury not to draw any adverse inferences from his absence. Yes, the only thing the judge said was he's absent. Don't hold it against him and don't draw an adverse inference. But that's not good enough because that doesn't substitute for the right of confrontation. So do you think it would have been better for the judge to say that Mr. Lovejoy was being obstinate and misbehaving himself and therefore I excluded him from the courtroom? That's what the defense counsel thought. That's what the defense counsel asked for. I think it would have been better for the judge to say Mr. Lovejoy is unable to be present this afternoon. If the defense counsel asked for that and the judge gave it, I think we'd probably be here on a different issue today, don't we, counsel? Let me ask you this question. You don't have to answer that. It was rhetorical. You had asked and you wrote in your brief that the judge should have sent him to another courtroom to observe the proceedings. But that was never requested at the trial, was it? That was not requested this time around. And frankly, I think that's half a loaf. I think that's a good thing to do in the pretrial proceedings. But, you know, on reflection, preparing for this argument, I would say that it really doesn't solve the problem either. It's no better. It mitigates the problem a little bit, but it's no better from the standpoint of the prejudice is both unknowable and the prejudice is he cannot have the jury see her look him in the eye when she's giving her testimony about the two flaws in her testimony. She is the linchpin witness in the case, in the state's case. She was more important than anything else. The LCV turning purple corroborates her testimony. The LCV turning purple is issue two. But her testimony is the linchpin of this case. That's what the Supreme Court said. But she wasn't his accuser in this case, like the Coy case that you cite with the sexual assault victim. Camp wasn't his accuser. She was merely another witness. And an expert witness at that. Respectfully, Your Honor, I think that's a fiction because she is very much the accuser. She was the accuser. She wasn't the victim, the prosecutrix. But she's there saying, I got a negative test for blood at the center of the towel where I swabbed. I think it's a false negative. But I don't have an explanation for that. I can't imagine what the chemistry is on that. Well, speaking of the chemistry, I had one question. I know your time is up, but one quick question on the Frye issue. Are you contending that the process of conducting the LCV test following the superglue fuming is a distinct methodology? That is, the combination that is and should have been reviewable at a Frye hearing in order that this combination was a methodology for the determination of or indication of the presence of blood? Yes. It's the sequence that is important. It is the sequence of first the superglue followed by, and I make an effort in the reply brief to use the words followed by, but that sequence, the FBI processing guide in its introduction says stick to these sequences. These sequences are what is important. You have to follow these sequence. And that sequence is the problem. This is a case of first impression, correct, on that particular issue? There are no decisions in Illinois. There are no, never at a Frye hearing to my knowledge. It's a handful of cases where it's been challenged. It's very important evidence because it says that if it turns purple, this stuff lit up like a purple light bulb, is what the prosecution said to the jury. It's science. You know, it's infallible science. I'm not going to say it's infallible. You know what I'm saying. And our review would be de novo on that issue. You would agree? Yes. All right. Okay. You'll have time on rebuttal. Thank you. I'm sorry. I guess I'll sit down. Well, we have a lot of questions for you too, so. Okay. Thank you. Thank you. Mr. Seneca. Good morning, Your Honors. My name is Randy Seneca. I'm an assistant state's attorney at Page County. I represent the people in this matter. Counsel, may it please the court. My first experience with this case came through defendant's brief. I didn't know anything about the facts, what happened below. And I read the statement of facts, and I read the first issue, and I thought to myself, I might have a problem here. It looks like this particular defendant made some disrespectful, disruptive comments to the trial judge. This appears to have been an isolated incident, and yet the trial judge removed him from a portion of his trial. And so I went to one of my colleagues at Page County and said, relate my concern. And he looked at me, and he chuckled, and he said, you don't have the record yet, do you? And I said, no. He said, read the record and then come back to me. And upon reading the record, I realized this wasn't the first time the defendant had been removed, nor was it the second, nor was it the third, the fourth, and so on. But why does that matter, counsel? Well, it matters for this reason, Your Honor, and I'm glad you brought that up. The pattern of behavior demonstrated by this defendant was completely familiar to the trial court, and she relied on that pattern of behavior when she removed the defendant in this instance. The defendant had a history of argument with the trial court over his representation. He wanted counsel other than the public defender. So he filed motions alleging a conflict of interest, motions alleging ineffective assistance. The trial court went through these motions with the defendant, showed the defendant they were meritless, and refused to appoint counsel outside of the public defender's office, at which point, and this happened several times throughout the proceedings below, the defendant would say, well, I'm going to have to hire my own counsel, so give me time for that, give me three weeks so I can hire my own counsel. And he didn't get that much time, but he did get some time to inquire into hiring his own counsel. Nothing ever came of it. And proceedings would continue, and then he would say, well, I'm going to have to go pro se. I'm going to go pro se since I can't counsel outside of the public defender's office. And the trial judge would entertain these motions, and he did, in fact, make several motions to go pro se. And when it came to time for him to relinquish his right to counsel, to waive his right to counsel on the record, he would say, well, I'm only doing this because you're forcing me. You're forcing me to waive my right to counsel and go pro se, and that's why I'm doing this. So his relinquishment of counsel wasn't knowingly involuntary, and the trial court couldn't accept it. And it was at that point during the trial that defendant had his outburst, that defendant objected, that the defendant insulted the trial court, calling her court a kangaroo court. He did this more than once. He said that she was prejudiced against him. He said that more than once. Well, how do you respond to counsel's argument that this was a key witness and that the defendant was denied his right of confrontation to a key witness in this murder trial? Well, much in the same way you did, Your Honor, that this is an expert witness. There's no indication in the record, and I've argued in my brief, there's no way defendant could have helped in the cross-examination of this particular witness, unlike the cases where confrontation clause rights were held to be affected by a removal like this. So is that the issue, whether or not he could have helped? Is that what we're to look at? Well, in terms of prejudice, yes, but we don't even get there because this is not an abuse of discretion. The trial judge based her decision based on a continuing pattern of behavior of this defendant that was escalating as the proceedings got closer to trial. His outburst became more pronounced when he got closer to trial. He didn't want to go to trial. Guilty defendants don't want to go to trial. They want to delay the proceedings as much as they can, and that's why under Allen a contempt citation would have been planted right into the defendant's hands. Defendant argues that he could have been cited for contempt. Well, he gets cited for contempt. That delays the trial. That's exactly what the defendant wanted. Well, you might have a point, certainly, logically there, and I think the record reflects the defendant was difficult, disruptive, argumentative. Opposing counsel's point perhaps is a little more subtle. He's saying, well, that may all be true, but the defendant was never actually disruptive in the presence of the jury. What is your response to that? Does that make it a little bit different because it wasn't a situation where he was in front of the jury when this happened. He seems to be saying, should he have had the chance to see his behavior before? Well, I agree with Your Honors that you can't wait for the defendant to potentially cause a mistrial by acting out in front of the jury in a case like this. And also on that point, it's got to be noted that this removal occurred during the trial. It was during, you know, it was about halfway through the trial, and by happenstance the jury was dismissed because they were going to do the voir dire of Tambi Camp outside the presence of the jury. But this was during the trial, and his arguments and his insults of the trial judge did delay the trial. He was saying whatever he wanted. You know, he should not have been granted free reign to say whatever he wanted to the trial court during the trial or in pretrial proceedings. Are you aware of any case law that it is an illegal requirement that the trial judge has to wait until the defendant obstructs or acts up in front of the jury before the order can be imposed? I'm not aware of any case law on either of those counts, either in front of the jury or not in front of the jury. But several of the cases, while they don't use it as a means of getting to the end of the case, the disruptions occur outside the presence of the jury. I mean, in several cases cited, that's when it occurred. So those cases would support that proposition. Did this judge consider alternatives, that is, putting him in a different courtroom to observe the proceedings, so at least part of his right to confrontation or at least view the trial proceedings would have been protected? In two previous circumstances, when he was disruptive, courtroom 4000 was contemplated. And that's not a separate courtroom where the defendant goes. That's a separate courtroom where the entire trial goes. And there's a room in that courtroom where the defendant can sit if he's being disruptive. It's a room across from the jury panel. With a one-way mirror? No, it's glass. And it's steel-reinforced glass. Oh, I see. And it's directly across from the jury box. So the jury box is looking right at the defendant behind this plate of steel-reinforced glass. And it's microphones and the defendant can hear the testimony. Right, right. Defense counsel did not ask for that in this case? He didn't. And on one occasion, Judge Cresswell did utilize it. And on another occasion, she tried to utilize that courtroom, but it was unavailable. And as I said in my brief, there's absolutely no indication in the record that that courtroom was available on this particular moment. And actually, the inference to be drawn is that it wasn't because she had used it once before and tried to use it unsuccessfully another time before. So the only reasonable inference from this record is that it wasn't available. So just to sum up succinctly, the court did not abuse his discretion in this case in removing him during that portion of the trial. Why? Because of his pattern of behavior, of seven years of behavior, and it's an abuse of discretion standard. And you can't possibly say that this judge abused her discretion in relying on this pattern of behavior. Defendant thinks that this removal should be viewed in a vacuum, that you should only look at this. And that's not reasonable, Donna. Counsel makes a point that, you know, this was very important for him to be present in the courtroom when the blood footprints in the bathroom were discussed. Were there other witnesses who discussed this bloody footprint in the bathroom besides this camp wherein the defendant was present? Multiple. Dabney, the crime scene technician, a lot of testimony on it. And Leroy Keith, the fingerprint analyst, a lot of testimony on it. The photographs depicting the bloody footprint pre-LCV testing was presented to the jury. I mean, there was a lot of other evidence besides Tammy Camp's testimony. And the defendant was present. Yes. Yes. Per Allen, did the trial court have to make specific findings, or should the trial court have made specific findings with regard to the defendant's conduct before he was excluded from the courtroom? Findings on the record. Should the court have come right out and said, I don't believe the trial can continue with him here? Yes. I don't know of any case law that says that those exact words must be some type of incantation that must be said. It was clear from the record that on all other instances he was removed, the only way to get him to stop obstructing what was going on was to remove him. It wasn't the case where she said to Mr. Lovejoy, if you do that again, Mr. Lovejoy, I'm going to remove you. And then the next time he did it, he was removed. He was warned over and over and over and over again during the very proceedings where he was removed. And it was only at the last trial that he was removed. In this particular instance, he had been warned twice that if you don't stop interrupting, you are not going to be here this afternoon when the trial continues. Those specific warnings came out of Judge Creswell's mouth twice during this removal, which was during trial. Now, if on the Frye issue, if it were error, if we assume it was error not to conduct a Frye hearing, how could that be harmless error, given the importance of the testimony and what our Supreme Court said about this footprint, that it was the linchpin of the State's case? The defendant is obviously trying to make hay with that particular statement from the Supreme Court. I didn't agree with it then when I went back and read the opinion. I don't agree with it now. There is plenty of other evidence in this record to show that this footprint was made in blood. Michael Dabney said it was a visible footprint in blood prior to LCB testing. Leroy Keith said that it was a patent print made like an ink stamp where the defendant had the blood on the bottom of his foot and stepped down to show that it was a bloody footprint. So the LCB testing, in my mind, is a red herring. I think what the defendant is trying to argue, and there's actually no support in the record for this, is that somehow the superglue fuming caused the LCB to turn purple. The defendant had two years to get an expert on blood evidence. If there was an expert out there that would have said that, he would have found him, and that expert would have testified. There is no evidence on this record to support that. And absent any evidence, that's an argument that can't be made. Let's phrase it another way. If we were to determine that the admissibility of the LCB testing was, at most, harmless error, would we even need to address the propriety of not having a crime record? No, not at all. And the evidence against this defendant was overwhelming. Since both of my arguments are buttressed by a harmless error argument, if I could just recount the evidence, for your honors, the motive evidence. Erin gave a written statement of how the defendant raped her. She made the same statement to her neighbor, made the same statement to medical personnel. She made the same statement to her mother. This statement was corroborated by the DNA evidence of defendant's saliva on Erin's breast and cheek. The DNA was matched in one to 140 trillion. 140 trillion. Seven billion people on the earth. 20,000 earths is 140 trillion. So one out of the population of 20,000 earths is the ratio here. The defendant's phone was off during the murder. He wouldn't go to the hospital to visit his wife after Erin had died. He didn't even ask what had happened to Erin and why she was at the hospital. The interview, although the defendant didn't confess, is one of the most damning and inculpatory interviews I've ever seen. He is so clearly lying throughout the interview, it's palpable. Just viewing it, he's asked questions about where he was after, you know, where he was that morning. He doesn't remember where he stopped for coffee. He doesn't remember where he drove. He doesn't remember where he parked. And these are all things that he's saying he did during the murder. He says he went to the townhouse to pick up his dog for an appointment. And when confronted with the fact that he had already changed the appointment to later in the afternoon, he didn't know what to say. He just put his head down. And there's forensic evidence beyond the footprint that linked him to this murder. There's the broken pieces of the knife that had Erin's DNA and the victim's, sorry, and defendant's DNA. There's the glove impression in blood on the doorknob that matched the gloves that were taken from his work locker. There's a palm print on the garbage bag roll showing that he cleaned up afterwards. And Valerie's unrebutted testimony that he never messed with the garbage, he didn't do anything with the garbage. The evidence was just overwhelming against this defendant. And the independent evidence concerning the footprint, the fact that it was bloody footprint, apart from the LCV testing, is also overwhelming. I've already recounted it. Dabney's testimony, Leroy Keith's testimony, and all the pictures. So even if we find that the glue fume followed by the LCV, the combination is new or novel, you're submitting that regardless of no prior hearing, the evidence was sufficient? Yes. And in support of his argument, the defendant makes some other arguments that are absolutely unsupported by the record. And just one more I'd like to bring up. He says that it's possible that Aaron's DNA could have gotten on the swab from the footprint from stray skin cells of Aaron that were deposited weeks before the murder. He makes this argument in the close of his reply brief without any citation to the record because there isn't any. If that were a possibility, again, he had two years to present an expert to say that was a possibility. He was unable to do so. It's not a case where a defendant is stepping out on shaky ground. It's a case where he's stepping out into thin air. There's nothing to support that assertion. And the same, if I could just wrap up in one minute, the same is with evidence or the testimony of Leroy Keith. Keith said that this could not have been a preexisting footprint that was later covered in blood, that the covering would have obliterated the print. And he's persisting in that argument here that that was a possibility. No evidence to support that. He had two years to get an expert to say that was a possibility. He couldn't do it. The only evidence says it's not a possibility. No, nothing. Thank you. Thank you very much. Mr. Fossett. I would mention the Supreme Court opinion, then Issue 2, then go back to Issue 1. The Supreme Court had the opportunity to say the evidence was overwhelming. It did not. It remanded because it said the evidence is sufficient. But sufficiency and overwhelming are different things. The evidence is not overwhelming here. The Supreme Court noted that the testimony at the first trial established that skin cells could have accounted for the DNA at the center of the tile. And the reason the Supreme Court said that was not that it was making it up, because that was the testimony in the cross-examination of Dabney and Keith and Camp. It's a bathroom and skin cells, saliva, urine, what have you, could be on the floor, anything that could provide a nucleus. The supposition that there was blood at the center of the tile was based upon the inference from DNA, but DNA could be there from skin cell, saliva, urine, or other bodily substances. So we really don't know that Aaron's blood was at the center of the tile per Ms. Camp's testimony because her test was negative for blood. And that is a very sensitive test, according to the Supreme Court's opinion, which cites the defense expert, which we did get, who said TNP is a very sensitive test. Basically on Issue 2, I would say that it was the most damaging testimony that there was, the LCV turning purple. It supported Tamara Camp's conclusion by inference. And it might be not true that it's blood. As the defense cross-examined the state's witness, they said other substances than blood caused the LCV to turn purple. Well, we don't know what they are. And so there was a whole range of false positives that are possible. What we're saying is that they are the proponent of the evidence. They have to show meat fry. We don't have to get an expert until the judge says, okay, now it's time to go hire an expert. Budgets are tight. You don't go hire experts for nothing. They are the proponent. They could not show general acceptance. This was the most important item of evidence. Yeah, they had the investigators who eyeballed Red and Brown's thing. They said, that's probably blood. Pictures say that's probably blood. And she says it's DNA. But that's all opinions. And what they said to the jury was, it's lit up like a purple light bulb because it all turned purple. That means it's all blood. And Tamara Camp said she couldn't. This is the prosecutor telling the jury. Tamara Camp, remember, she said she couldn't think of anything that could be other than blood. On issue one, I think that the basic premise of Allen is that the judge is not supposed to presume anything other than no waiver. So the reason the judge has to wait and see what's going to happen is there's a presumption against removing him. The trial judge did not honor that presumption. The trial judge did not make a finding. And I don't care whether the judge is required to make a finding. The absence of a finding is of evidential value to this court. The judge made no finding that he was going to disrupt the trial, that the trial could not proceed. What the judge said was, he disobeys me. He ignores my admonitions. This is right before lunch. Obviously, Mr. Lovejoy is irritating. He was out of line. No question. I don't know why he thought he had to make objections. But the judge acted prematurely by excluding him. All she had to say is, your motion to recuse me is denied. Let's go to lunch. And then tell the lawyers to counsel him. On the 4th of April, 2010, on page 25, Mr. Lovejoy made an objection. And the judge said, your objection is noted for the record. Had the judge been a little less irritated by him, that's what she could have said on this occasion in trial. It is not right for the judge to, by rote, apply as a remedy that she used in the pretrial proceedings and locally apply in the middle of trial to exclude Mr. Lovejoy from the most important witness in the state's case. That's what the Supreme Court has said is the lynchpin in the state's case. It was unnecessary for the court to remove Mr. Lovejoy at that point. It was unjustified by the record. And it's unconstitutional. And Mr. Lovejoy respectfully requests this court to grant a new trial. You said that the defendant didn't have to hire an expert. You're saying that the Supreme Court told you that this was a lynchpin of the case, but it wasn't that much of a lynchpin to hire an expert. Well, we hired an expert, Dr. White, who's quoted in the Supreme Court opinion regarding the negative for TMB test. Dr. White testified at the post-trial motion for the first trial. Well, we did not hire – we did not get an expert to address the sequence of superglue followed by LCV because we didn't have a fry hearing in hand. Dr. – or Mr. Keith testified, as your opponent points out, that the covering would have obliterated the print. That was unrebutted testimony, wasn't it? Well, I think it's – I think it was addressed and rebutted, but it's not really on point because the first point is it isn't blood to begin with. That's the fry issue. The jury argument would be if you don't get – if you can't exclude that evidence, then you've got to address what's that purple stuff on the ridge impressions. You know, the judge says the ridge impression can be read. It can be a comparison. That's fine. I'm talking about the ridge impression. But we're talking about the purple stuff on top of the ridge impression that they say was blood, and we say, wait a minute, you don't know that it's blood. It could be a false positive. So that is the issue, and Leroy Keith's testimony addresses the jury question, and the answer was that's based on the Creighton study. The Creighton study is a guy who poured blood down a wall. The wall bite fingerprints on a wall. But that's – this is a horizontal floor. At the beginning of his cross-examination, he said, I got fingerprints off of cars left out in rain and from underwater. And we cited the testimony from the prior trial, but in this trial he said that also. It's right at the beginning of his cross-examination. So I don't know what to say about if it is blood. That's a jury question. But we were saying, first of all, it's not blood to begin with, and you haven't shown that it's reliably established that it is. And it's your burden under five to show that it's generally accepted. And you can't do it beyond damn easy to say so. So that is the issue. It's a very important issue. They didn't have anything else that was nearly as powerful as what they told the jury. That stuff lit up like a purple light bulb. It's science. You've got to believe that. That's what the implication was. But we never got a chance to try to suppress that evidence. If the jury had only heard that you put the stuff on, it goes purple, it helps you see it better. It doesn't say anything about a chemical reaction. It doesn't say anything about science. It's simply an enhancer. That would be where we would be, and they would have been deprived of very powerful evidence. For all these reasons, the abuse of discretion, excluding Lovejoy, and the ruling on the Frey hearing, we'd ask the court to grant a new trial in order of Frey hearing for Mr. Lovejoy. Thank you, counsel. Thank you. At this time, the court will take the matter under advisement and render a decision in due course. We stand in recess until the next case. Thank you.